THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* DONALD EDWARD KING, Appellant.

Third Department, June 16, 1961.

*Michael Lo Pinto* for appellant.

*Roger B. Sovocool, District Attorney,* for respondent.

BERGAN, P. J. The appellant King appeals from a conviction of robbery, first degree, on Berry Runion. King, Runion, and two young women, Margaret Ann Sherman and Catherine Sherman, spent together part of the evening of July 24, 1958 drinking beer and vodka and going from tavern to tavern in and near Ithaca. They were driven by Catherine Sherman in her car.

After they left Ted Smith's hotel, where all had more drinks, and while on Triphammer Road, Catherine Sherman testified she stopped the car because defendant and Runion, who were riding in the rear seat " wanted to relieve themselves ". Runion related at the trial that he was not sure whether he or defendant had suggested the car be stopped.

He testified: " A. We got out. King and I both.

" Q. Who suggested that you get out, or why did you get out? A. I don't know who suggested it. We got out to relieve ourselves.

" Q. Who got out first, do you remember? A. I believe I did."

While they were standing outside the car he testified that defendant " told me to give him my money." He continued: " I thought he was kidding at first because I knew him, and then he said that again, and I said, ' Why should I give you my money? ' About that time he tackled me.

" Q. What happened? A. He wrestled me to the ground and he took my money."

He said that about $75 was taken from him and a bankbook.

He testified that King got back in the car which then drove away; Catherine Sherman testified that when defendant got back in the car alone, she asked him where Runion was and defendant said " Never mind, let's get going."

The crime shown by the record could be robbery in the first degree only if in the commission of the crime defendant was " aided by the use of " an automobile (Penal Law, § 2124, subd. 3). If it be shown by the prosecution that an automobile is used for transportation to the scene of a robbery and serves some effective part in its commission or in an escape, a jury might readily find that the " use " of such an automobile aids or helps the crime.

But a robbery committed in an automobile, for example, in the accomplishment of which the vehicle as such plays no effective part, would ordinarily be treated as a matter of law as not being " aided by " the automobile; and this would be the rule in other instances where an automobile was peripheral to the crime.

A good illustration of the effective " use " of an automobile in the commission of the crime is shown in *People* v. *Rudelt* (6 A D 2d 640) where it became the planned instrument by which the victim was transported to a place where it would be expeditious to rob her. Often effective use in the crime is demonstrated by planned use of the vehicle to get away from the scene to prevent detection or arrest.

On this record it seems possible for a jury to find defendant was " aided by " the Sherman car in the commission of the robbery; but it is a fairly close question. There is no proof whatever that defendant had intended in advance to use the Sherman car as an instrument in aid of the robbery; or, indeed, had intended in advance to commit robbery itself, until after the actual stopping at the scene of the crime and until after he and Runion had both gotten out together.

The stopping and getting out at that point seems to have been spontaneous and as much Runion's suggestion as King's. It is true that Catherine Sherman testified that King gave prior directions as to where to drive; but all occupants of the car were in search of more taverns at which to drink, and they finally turned around in Triphammer Road because they felt the last tavern would be closed.

Nothing in the record suggests that King guided the car to the road to stop at that place to rob Runion; indeed, the record negatives proof of such an intention and the stopping and apparently the robbery seemed to have been suddenly resolved; although Runion had been buying drinks and King knew Runion had some money and had asked him for a loan at one of the taverns.

It might be found, however, that the direction by King to Catherine Sherman to drive away would have constituted the use of an automobile to " aid " escape and hence its use to aid the crime; but this would have to be looked at pretty closely by the jury in the light of surrounding circumstances, including the fact all parties had been drinking for some time; the possible lack of fear of King for Runion after the robbery, and hence the need or absence of need, to escape; the part played by the Sherman car in this; and since Catherine Sherman was not an accomplice, the extent to which she and her car were under King's control.

This kind of a case, therefore, which does not follow the usual pattern of cases involving the use of an automobile in aid of robbery which the Legislature had in mind to constitute robbery, first degree, would require very careful and precise instructions

to the jury as to just what extent the car driven by Catherine Sherman aided defendant's crime of robbery.

A fair evaluation of the court's charge to the jury is that no enlightenment was given on the nature of this problem; and this was made greatly more prejudicial to defendant by further omnibus definition of robbery, first degree, by which the jury was literally permitted to find defendant guilty without any reference to being " aided by " an automobile.

The instruction on " aided by the use of an automobile " was given to the jury in the barest possible outline. On this point the court said merely: " The statute further provides that if a robbery, as I have described it to you, taking the property from the person of another by force, if the person taking the property is aided in this act by the use of an automobile or motor vehicle, that constitutes robbery in the first degree."

In the general instructions given later in the charge on degrees the jury might find, the court said this: " Now, there are more than one type of verdict which you may render in this case: If you are satisfied beyond a reasonable doubt that the Defendant in the nighttime by force took property of any value from Berry Runion, your verdict should be that of robbery in the first degree."

This instruction permitted the jury to find first degree robbery without reference to use of the automobile; and in view of the failure to enlighten the jury at all on that subject earlier in the charge, the conclusion that the charge prejudiced defendant seems quite inescapable.

The summation of the District Attorney was in some parts inflammatory; and it was prejudicial to defendant. Three prior traffic convictions had been admitted by defendant on cross-examination by the prosecutor: driving without a license; driving while license was suspended; and reckless driving.

Using these convictions on summation as an argument to the jury to see if defendant " meets the description " of " some criminal type ", the prosecutor said this: " The robbery statute is designed to prevent the taking of money under any circumstances by a person from another by force, violence, or fear, and the slightest amount of force, if you accomplish the deed, is sufficient. Let's not try to conjure up some criminal type here and see if Donald King meets the description. After all, I have shown you he has had some convictions. All we have to be is be satisfied in our minds that Donald King did do these acts."

In our view this exceeded reasonable bounds and it is in the light of this that the further prejudiced plea of the prosecutor

to the jury to render a " service " to the community by convicting defendant must be evaluated: "I say to you, ladies and gentlemen, that you would not be doing this community any service or Donald King himself if a verdict of guilty was not returned in this case."

There seems also to have been a departure from the statutory procedure by which the 12 regular jurors and the two alternate jurors, 14 in all, could have participated in the deliberations on defendant's guilt after the case was fully submitted. When the court had finished the submission of the case, it said this to the 14 jurors: " Arrangements will be made for the jury to go to lunch. You may or may not start your deliberations. You can go to the Jury Room now, and as soon as the arrangements are made, the attendants will take you to lunch. You may now retire. The alternates may go to lunch with the Jury, and upon your return to the Court Room, if all the Jury return to the Court Room, you may then be excused until January 5th at 10:00 o'clock."

This instruction permitted the jury to begin deliberations at once, before lunch, and presumably during lunch; and it appears that the alternates were permitted by this instruction to stay with the 12 regular members of the jury until " all the jury " returned to the courtroom after lunch.

It seems clear from the provisions of section 358-a of the Code of Criminal Procedure that under no circumstances may more than 12 jurors participate in the actual deliberations; the court merely fills in the places of any who for illness or other statutory cause, after submission, cannot continue in the case. But until such an event arises, the alternates must be kept " separate and apart from the regular jurors " after submission (§ 358-a).

These matters in their totality seem to us important enough to warrant a new trial.

We add that Mr. Michael Lo Pinto who on our assignment has prosecuted this appeal has discharged his assignment with diligence and skill.

The judgment of conviction should be reversed on the law and the facts and a new trial ordered.

COON, GIBSON, HERLIHY and REYNOLDS, JJ., concur.

Judgment reversed on the law and the facts and a new trial ordered.