# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CAROLYN WELBORN, TORI FOLEY, and GABRIEL MEEKINS, | DIVISION ONE |
| Appellants, | No. 82235-7-I |
| v. | UNPUBLISHED OPINION |
| SNOHOMISH COUNTY, and JASON TONER and MELISSA TONER, a married couple, | |
| Respondents. | |

DWYER, J. — Carolyn Welborn filed suit alleging that she developed certain psychological and physical conditions after being aggressively confronted by an off duty Snohomish County Sheriff's deputy. A jury returned a defense verdict. On appeal, Welborn challenges a trial court ruling excluding evidence that her encounter with the deputy resulted in lost wages. Welborn and her co-plaintiffs also assert that the trial court erred by denying them a new trial based on the court's imposition and enforcement of time limits on the parties during trial.

Because the jury rejected Welborn's claim that the deputy's conduct proximately caused Welborn's injuries, Welborn cannot establish that she was prejudiced by the exclusion of evidence that her injuries further resulted in lost wages. In addition, appellants fail to establish that the trial court abused its discretion by denying a new trial. Accordingly, we affirm.

I

In February 2018, Carolyn Welborn was employed by Condominium Management as a community manager. In that role, Welborn would help homeowner and condominium association boards enforce their rules and regulations, including by regularly "driv[ing] through a community looking for things . . . that are not in compliance."

On February 8, 2018, Welborn conducted such a "drive-through" of the Copper Station community in Stanwood accompanied by two Copper Station homeowner association (HOA) board members, Tori Foley and Gabriel Meekins. Welborn drove her personal vehicle and picked Foley and Meekins up from their respective homes in Copper Station.

As the drive-through was nearing its conclusion, Welborn pulled her car over to the side of the road so that she and Foley could investigate and discuss a possible violation. Welborn backed up so that her car was parked in front of a truck that was also parked on the side of the road. Welborn later testified that, as she and Foley finished their conversation, she began pulling back onto the road when "a vehicle came on our left side at a high rate of speed . . . and pulled his car in front of my car, blocking me from the front from being able to move." Welborn testified that a man she did not recognize then "started in a very fast pace coming at my vehicle," and that he was "yelling something." Welborn recalled feeling "panicked" and "just screaming, 'I'm on the board, I'm on the board.'"

Meekins, who was sitting in the back seat, could see only the man's torso

2

as he approached the car. Meekins later testified that as the man "rounded the rear driver side corner of his vehicle at a very fast pace, all I saw was this black gun that was exposed . . . with his sweatshirt purposely tucked in behind this exposed weapon and [the man's] hand . . . near it in a ready position." Meekins recalled that when the man got to Welborn's car, "his hand c[a]me up and then he slap[ped] his hand down on top of the roof of the car and ben[t] down and start[ed] yelling." The man then looked in the car and, at that point, Meekins recognized him as Jason Toner, Meekins's neighbor in Copper Station. Toner is a Snohomish County Sheriff's deputy but was not on duty at the time. Foley later testified that, upon seeing Meekins in the back seat, Toner "turned around immediately and ran to his car, like a quick walk . . . [a]nd then drove out, peeled out and rounded the corner."

In January 2019, Welborn, Foley, and Meekins sued Snohomish County and Toner in his capacity as a Snohomish County employee (together, the County Defendants). The plaintiffs also named Toner individually and his wife, Melissa, as defendants.[1] All plaintiffs alleged federal civil rights violations by the County Defendants, negligent supervision by the County, and negligent infliction of emotional distress (NIED) by all defendants. Additionally, Foley and Meekins alleged defamation and false light claims against the Toners based on social media posts the Toners made after the February 2018 incident. Welborn also alleged a "personal injury" claim against the County Defendants and Toner.

The County Defendants removed the case to federal district court, which

---

[1] Because Jason and Melissa Toner share a last name, we refer to Melissa by her first name for clarity.

remanded the matter to the superior court after summarily dismissing the federal claims.  See Welborn v. Snohomish County, No. 2:19-cv-00355-RAJ, 2020 WL 1904060, at *5-7 (W.D. Wash. Apr. 17, 2020).

After remand, the superior court dismissed additional claims on summary judgment.[2]  As a result, the only claims to proceed to trial were (1) Welborn's "personal injury" and NIED claims against the County Defendants[3] and Toner and (2) Foley's and Meekins's defamation and false light claims against the Toners.

Before trial, the court engaged counsel in a colloquy about the trial's anticipated length.  The court observed that although it had received written time estimates from the parties, "it doesn't appear that they were created collaboratively," and the court was "not sure [it was] understanding exactly what it [wa]s that [it] ha[d] been given."  As a result, the court suggested that it "go through each of the witness lists . . . so that [it] can understand who is actually being called and how long their testimony will take."  The court proceeded to list each witness, asking counsel for each party to estimate how much time would be required for examination.  When finished, the parties each confirmed that the court's witness list was complete.  The court summed up the parties' time estimates and arrived at a total of 25.02 hours.

On the first day of trial, after the parties made their opening statements, the court indicated that it would allocate 8.5 hours to each party (the plaintiffs, the

---

[2] These dismissal orders are not at issue in this appeal.
[3] Welborn's claims against Snohomish County were based on the theory that the County was vicariously liable for Toner's conduct.

Toners, and the County Defendants) for witness examination, "which gets us to slightly over your estimate." No objection to this time allotment was interposed. The court later explained that it settled on 8.5 hours by "add[ing] up all the time you requested and divid[ing] it by three, and then round[ing] up a little bit."

The court also observed that "some of the opening statements made me concerned that maybe I haven't understood everything that was litigated pre-trial on the issue of damages" and asked for clarification as to whether Welborn was claiming lost wages.[4] Welborn confirmed through counsel that she was, based on her asserted inability to work after her encounter with Toner. The court expressed its general understanding that expert testimony was required to establish Welborn's inability to work and asked the parties to submit briefing on that issue. The court later ruled that it would exclude evidence of Welborn's past and future lost wages, explaining that Welborn "has not proffered any evidence that would prove: a) the actions of Defendants caused Plaintiff Welborn's psychiatric or physical disabilities and/or b) the alleged wage loss was proximately caused by Plaintiff Welborn's alleged injuries."

Trial took place over eight days in October 2020. Welborn testified that three days after her encounter with Toner, she developed a rash. Physician assistant Rochelle Trussell, who later examined Welborn at a dermatology clinic, testified that she diagnosed Welborn with urticaria dermatographism.[5] According to a medical record admitted at trial, Welborn had received a previous diagnosis

---

[4] The judge who presided over trial was not the same judge who presided over the bulk of pretrial litigation.

[5] Trussell described "dermatographism" as "a fancy name for a type of hiving."

of urticaria in 2011.

Welborn's treating physician, Dr. Karen Myren, testified and opined that Welborn's encounter with Toner more likely than not worsened Welborn's urticarial (which is also a skin condition or rash). She testified that she also diagnosed Welborn with posttraumatic stress disorder (PTSD) in spring of 2018, and she opined that it was "more likely than not that that event caused or significantly contributed to the PTSD."

The defendants sought to rebut Dr. Myren's opinions with testimony from Dr. Renee Bibeault, a psychiatrist with a focus on women's mental health, and Dr. Kent Carson, a physician with a specialty in dermatology. Dr. Bibeault opined that Welborn did not have PTSD and that although she suffered from unspecified trauma and stresser related disorder (UTSD), her encounter with Toner did not cause it. Dr. Carson opined both that stress does not cause or trigger dermatographism, and that Welborn's symptoms "were a natural progression of a pre-existing condition that would have occurred even without the event on February 8th, 2018."

Meanwhile, after Foley and Meekins testified, the Toners moved to dismiss the defamation and false light claims against them. The trial court granted the motion in part and dismissed (1) the defamation and false light claims against Toner, (2) Foley's defamation claim against Melissa, and (3) Meekins's false light claim against Melissa.[6] Consequently, at the conclusion of the evidence, the only claims submitted to the jury were (1) Welborn's

---

[6] These rulings are not at issue in this appeal.

"personal injury" and NIED claims against the County Defendants and Toner, (2) Foley's false light claim against Melissa, and (3) Meekins's defamation claim against Melissa. The jury returned defense verdicts on all of these claims. With regard to Welborn's claims, the jury found that Toner was negligent but that his negligence was not a proximate cause of injury or damage to Welborn.

The plaintiffs subsequently moved for a new trial. They argued, among other things, that the trial court erred by imposing time limits on the plaintiffs' trial presentation "when no authority exists to support this order." The plaintiffs also argued that the trial court's enforcement of the time limits denied them the opportunity to fully cross-examine Drs. Bibeault and Carson and to call two witnesses: Foley's husband and Melissa. In addition, the plaintiffs contended that a new trial was warranted because the trial court erred "by preventing . . . Welborn from presenting evidence of special damages regarding lost wages."

The trial court denied the motion. Welborn, Foley, and Meekins appeal.

II

Welborn contends that reversal is required because the trial court erred in excluding any evidence of her lost wages claim. Because Welborn cannot establish that she was prejudiced by the trial court's ruling, she does not establish an entitlement to appellate relief.

A party seeking reversal based on a trial court's exclusion of evidence must demonstrate prejudice, "for error without prejudice is not grounds for reversal." Brown v. Spokane County Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983). Here, Welborn bore the burden to prove that Toner's

7

conduct was the proximate cause of her injuries, including her asserted inability to work. Little v. Countrywood Homes, Inc., 132 Wn. App. 777, 780, 133 P.3d 944 (2006). To satisfy this burden, Welborn had to prove both that (1) Toner's conduct caused Welborn's conditions and (2) Welborn's conditions caused her inability to work. See Mehlert v. Baseball of Seattle, Inc., 1 Wn. App. 2d 115, 118, 404 P.3d 97 (2017) ("'A proximate cause is one that in natural and continuous sequence, unbroken by an independent cause, produces the injury complained of and without which the ultimate injury would not have occurred.'" (quoting Attwood v. Albertson's Food Ctrs., Inc., 92 Wn. App. 326, 330, 966 P.2d 351 (1998))).

Welborn presented Dr. Myren's expert opinion that Welborn's encounter with Toner caused or contributed to her PTSD and urticaria dermatographism. But the jury rejected that testimony, finding that Toner's conduct, though negligent, was not a proximate cause of injury or damage to Welborn. Given the jury's rejection of the first link in the causal chain between Toner's conduct and Welborn's asserted inability to work, Welborn cannot establish that she was prejudiced by the exclusion of evidence tending to establish the second link in the chain. Welborn is not entitled to appellate relief.

III

The plaintiffs contend that the trial court erred by denying their motion for a new trial. This is so, they assert, because (1) the trial court's allocation of time among the parties was arbitrary and (2) those time limits forced the plaintiffs not to call certain witnesses and limited their ability to cross-examine defense

8

experts.[7],[8]  We disagree.

"Appellate courts review a trial court's denial of a motion for a new trial for abuse of discretion." Coogan v. Borg-Warner Morse Tec Inc., 197 Wn.2d 790, 806, 490 P.3d 200 (2021). "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" Andren v. Dake, 14 Wn. App. 2d 296, 305-06, 472 P.3d 1013 (2020) (quoting Teter v. Deck, 174 Wn.2d 207, 215, 274 P.3d 336 (2012)). We determine whether the trial court abused its discretion by considering the totality of the circumstances. See, e.g., State v. Banuelos, 91 Wn. App. 860, 864, 960 P.2d 952 (1998); In re Marriage of Stenshoel, 72 Wn. App. 800, 814, 866 P.2d 635 (1993).

A

The plaintiffs sought a new trial under CR 59(a)(1), which provides that a new trial may be granted for "[i]rregularity in the proceedings of the court . . . , by which [the party seeking a new trial] was prevented from having a fair trial." On appeal, the plaintiffs contend that an irregularity occurred because the trial court arbitrarily divided the parties' total time estimate by three, "completely

---

[7] The plaintiffs also assert that a new trial should have been granted due to the trial court's exclusion of Welborn's wage loss evidence. This assertion fails because, as discussed, Welborn cannot establish that she was prejudiced by the exclusion. See CR 59(a) (providing that a new trial may be granted for enumerated reasons that "materially affect[ed] the substantial rights of [the party seeking a new trial]").

[8] The plaintiffs also invoke procedural due process without mention—much less analysis—of the Mathews factors. See City of Bellevue v. Lee, 166 Wn.2d 581, 585, 210 P.3d 1011 (2009) (appellate courts apply the balancing test set forth in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), to determine whether due process requirements are met). Such "'naked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" State v. Gunwall, 106 Wn.2d 54, 62, 720 P.2d 808 (1986) (quoting In re Rosier, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986)).

disregard[ing] the respective burdens of each of the parties."

To the contrary, the trial court's allocation of time was not arbitrary; it was based on the estimates given by the parties before trial. To this end, we observe that the plaintiffs' estimates totaled 9 hours and 5 minutes—35 minutes more than the 8.5 hours ultimately allocated to them. Importantly, however, the plaintiffs neither pointed this out nor objected to the court's allocation. Additionally, the 9 hours and 5 minutes included a total of 40 minutes to cross-examine a vocational rehabilitation expert and an economist that the defendants anticipated would not be—and ultimately were not—called due to the trial court's earlier rulings in limine. In other words, the 8.5 hours allotted was more than the amount of time the plaintiffs indicated they would need to examine witnesses that likely would be called.

Furthermore, it is undisputed that the trial court informed the parties each day of how much time they had remaining. And the trial court made clear that it would consider giving the parties more time for good reason. For example, it indicated that it planned to hold the parties to the time limits "absent some very significant change in the way evidence is presented or something that becomes relevant that we didn't anticipate at this time." Later, after plaintiffs' counsel explained that he had limited his direct examination of the first witness under the mistaken belief that the court was tracking time on a per-witness basis, the court responded, "If that was not clear to you and you want to spend [a] little bit more time with this witness on redirect, I'll give you some latitude to do that." Additionally, after informing the plaintiffs that they had used up their time, the trial

court stated, "[I]f there is a particular witness that you need to question, you can make an offer of proof to me as to what you need and we can talk about it."  The court reiterated, the next day: "[Y]ou can certainly make an offer of proof with respect to any additional time that you might need."

Under these circumstances, the court acted within its discretion by imposing an 8.5-hour limit on the plaintiffs' trial presentation.  See State v. Dye, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013) (trial management decisions are vested in the broad discretion of the trial court).  Thus, the trial court was also within its discretion to conclude that its imposition of this limit was not an irregularity in the proceedings warranting a new trial under CR 59(a)(1).  The plaintiffs' conclusory assertion that they should have been given more time because they bore the burden of proof does not persuade us otherwise.[9]

B

The plaintiffs next assert that an irregularity occurred in that the application of the time limits "forced" the plaintiffs to forgo calling Foley's husband and Melissa as witnesses and prevented them from fully cross-examining Drs. Bibeault and Carson.  The record does not support this assertion.

On the sixth day of trial, during the plaintiffs' direct examination of Toner, the trial court informed plaintiffs' counsel that he had 34 minutes of examination

---

[9] The plaintiffs, wisely, do not renew the argument they made below that the trial court lacked *any* authority to place a time limit on their trial presentation.  Nevertheless, they suggest, citing Jones v. Sisters of Providence in Washington, Inc., 140 Wn.2d 112, 994 P.2d 838 (2000), that the trial court should have done so only upon the parties' stipulation.  The cited language from Jones explains that "trial courts should not ignore *mandatory rules* and should seek stipulations where permitted *when departing from such rules*."  140 Wn.2d at 120 n.13 (emphasis added).  It is unpersuasive here, as the plaintiffs point to no mandatory rule prohibiting the trial court from imposing time limits on the presentations of the parties.

time remaining. Although the plaintiffs had not yet called Melissa or Foley's husband at that point, they offered no indication that they required more time to do so. Instead, after a break, the plaintiffs represented to the court that Toner would be their last witness.

At the end of that trial day, the court informed the plaintiffs that they had used up their time but, as discussed, indicated that it would entertain an offer of proof "if there is a particular witness that you need to question." The plaintiffs still made no request for additional time to call Melissa or Foley's husband.

The next day, the trial court reiterated that the plaintiffs "can certainly make an offer of proof with respect to any additional time that you might need." Again, the plaintiffs made no such request with regard to Melissa or Foley's husband. Instead, after the trial court gave the plaintiffs additional time to conduct a re-direct examination of Toner, the plaintiffs rested their case.

With regard to Drs. Bibeault and Carson, the plaintiffs claim that the trial court permitted only 10 minutes for each cross-examination. The plaintiffs mischaracterize the record in advancing this claim.

By the time Dr. Bibeault testified, the plaintiffs had used up their allotted time. However, in keeping with its earlier statements, the trial court allowed plaintiffs' counsel to make an offer of proof as to the cross-examination of Dr. Bibeault. Counsel did so, indicating that he wished to question Dr. Bibeault about an opinion she rendered regarding Welborn's UTSD and whether there was any correlation with the rash Welborn experienced three days after her encounter with Toner. When the court asked, "How much time do you anticipate

that you need," plaintiffs' counsel responded, "If [I] take ten minutes, I would be surprised." The trial court then allowed counsel to proceed. Counsel indeed questioned Dr. Bibeault regarding the specified topics and, when finished, stated, "I have no further questions for this witness."

As for Dr. Carson, who testified after Dr. Bibeault, the court did not even require an offer of proof: it simply allowed plaintiffs' counsel to proceed with cross-examination, which counsel did. After the Toners' counsel conducted a re-direct examination, the court asked, "Any other questions?" Plaintiffs' counsel responded no.

In short, the record reflects that any limitations on the plaintiffs' examinations of Melissa, Foley's husband, and the defense experts were self-imposed, not court-imposed. At no point did the plaintiffs ask for more time to facilitate the testimony of Melissa or Foley's husband, or to continue cross-examining Dr. Bibeault or Dr. Carson. Consequently, they also did not explain to the trial court—and they fail to explain on appeal—what particular evidence they were unable to elicit from these witnesses and why that evidence mattered.[10] That the trial court did not give the plaintiffs additional time to examine these witnesses—when it made clear that it would entertain such a request but none was made—does not constitute an irregularity in proceedings warranting a new trial under CR 59(a)(1). The trial court did not abuse its discretion in denying the

---

[10] The plaintiffs assert that their not calling Melissa "was . . . exploited by Counsel for Defendant Toner who argued in closing to the jury Plaintiff's failure to call Melissa Toner arguably demonstrating the weakness of the defamation and false light claims." The record, which does not include a transcript of closing arguments, does not support this assertion. See Yorkston v. Whatcom County, 11 Wn. App. 2d 815, 824, 461 P.3d 392 (2020) ("[T]he appellant bears the burden of perfecting the record."), review denied, 195 Wn.2d 1020 (2020).

13

plaintiffs' motion for a new trial.[11]

IV

The Toners request an award of attorney fees on appeal under RAP 18.9, which authorizes the award of attorney fees as a sanction for filing a frivolous appeal. "An appeal is frivolous if 'no debatable issues are presented upon which reasonable minds might differ, *i.e.*, it is [so] devoid of merit that no reasonable possibility of reversal exists.'" Hartford Ins. Co. v. Ohio Cas. Ins. Co., 145 Wn. App. 765, 780, 189 P.3d 195 (2008) (internal quotation marks omitted) (quoting Olson v. City of Bellevue, 93 Wn. App. 154, 165, 968 P.2d 894 (1998)). Although we reject the plaintiffs' claims on appeal, we decline to impose sanctions. Therefore, we deny the Toners' request.

---

[11] For the first time in their reply brief, the plaintiffs claim that the trial court's imposition and enforcement of time limits was "objective evidence of bias." To the extent the plaintiffs argue that reversal is required based on judicial bias, this argument comes too late to warrant consideration. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration."). In any event, the plaintiffs do not point to any specific facts establishing actual or potential bias on the part of the trial judge, and "[j]udicial rulings alone almost never constitute a valid showing of bias." In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004); see also In re Marriage of Meredith, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009) (evidence of a judge's actual or potential bias is required; "bald accusations" are insufficient).

No. 82235-7-I/15

Affirmed.

Dwyer, J.

WE CONCUR:

Coburn, J.          Mann, C.J.